# DISTRICT COURT FOR THE UNITED STATES OF AMERICA
## DISTRICT OF COLUMBIA [Washington, D.C.]
### ARTICLE III

**Akuwa Ishak**
**6516 Ross Avenue**
**Chicago, Illinois 60621**
**319 209 3143 / 340 513 5300**
**manakuwaa@gmail.com**
**PLAINTIFF,**

      V.

GREENSBURG POLICE DEPARTMENT    (GPD)
14516 HWY 37
GREENSBURG, LA 70441

LEE CARMONA, POLICE            (CPDO)
14516 HWY 37
GREENSBURG, LA 70441

CEDRIC BURRIS, POLICE          (CPDO)
14516 HWY 37
GREENSBURG, LA 70441

MICHAEL MARTIN
14516 HWY 37
GREENSBURG, LA 70441

TOWN OF GREENSBURG            (TOG)
Greensburg Municipal Building
14516 Hwy 37, P.O. Box 160
Greensburg LA 70441

HAMMOND POLICE DEPARTMENT  (HPD)
120 S OAK STREET
HAMMOND, LA 70401

CHIEF EDWIN BERGERON           (CHPD)
HAMMOND POLICE DEPARTMENT
120 S OAK STREET
HAMMOND, LA 70401

POLICE OFFICER BRITTANY LUCIA    (POBLHPD)
HAMMOND POLICE DEPARTMENT
120 S OAK STREET
HAMMOND, LA 70401

Case: 1:23−cv−03151
Assigned To : Kelly, Timothy J.
Assign. Date : 10/20/2023
Description: Pro Se Gen. Civ. (F−DECK)

TANGIPAHOA CORRECTIONAL FACILITY    (TCF)
101 CAMPO LANE
AMITE CITY, LA 70422

PETE PANEPINTO, MAYOR
CITY OF HAMMOND MAYOR    (COHM)
310 E. CHARLES ST.
HAMMOND, LA 70401

CITY OF HAMMOND    (COH)
310 E. CHARLES ST.
HAMMOND, LA 70401

DEFENDANTS ET AL,
Individually, and as representatives of a defendant class
composed of all persons and entities et al.
   DEFENDANTS.

## VERIFIED COMPLAINT

### I. Nature of the Action

Comes now, PLAINTIFF, Akuwa Ishak ex rel Fanta Brooks of the Maipuri Arauan Nation, (the "PLAINTIFF") bring this claim to resolve issues of environmental racism, forced identity, official oppression, and denial of rights in violation of the United Nations International Covenant Convention on Civil and Political rights.

PLAINTIFF is an indigenous inhabitant of Chicago, Illinois and at all times relevant to these matters, PLAINTIFF has been recognized as a citizen of the indigenous Arawak tribal communities of Chicago, Illinois.

PLAINTIFF has sought redress from all DEFENDANTS and no response was provided from either DEFENDANT. PLAINTIFF sent all communications via Certified U.S. mail and certified return receipts and facsimile.

PLAINTIFF seeks remedy and makes claim for Violations of Environmental Racism and Violations of Human Rights, specifically, Plaintiff claims against Defendants, Et Al for damage and destruction of safe and productive existence, Constructive Fraud, Identity Theft, Unlawful Conversion, Economic Deception and Ethnic Cleansing, unlawful possession of human beings to be used as human capital, as described in US President Bill Clinton' Executive Order 13037, for

Violations of United Nations International Covenant Convention on Political and Civil Rights, Article 1 1,3, Article 2 1, 3a, Article 3, Article 5 1,2, Article 6 1,3, Article 9 1,2,5, Article 10 1, Article 12 2, Article 14 1, 3, Article 15, Article 26, and 42 USC §1983, Conspiracy to deprive rights (under §1983 and common law) Violation of Civil Rights Act., Negligence, Intentional and Negligent Infliction of Emotional Distress and injury.

In 2015 PLAINTIFF became a beneficiary of identity claims filed with the United States Commerce Department and the U.S. Census Bureau, and in 2020, a United States registered Constructive Notice was filed by PLAINTIFF; the Notice filed clearly identified PLAINTIFF as an American Aborigine of Arawak ancestry.

PLAINTIFF declares that on October 7th 2023, PLAINTIFF received a communication that the home that PLAINTIFF was visiting was being raided by official and unofficial members of the GREENSBURG POLICE DEPARTMENT (GPD). Instead of going back to the location in Greensburg, PLAINTIFF decided to secure a hotel in Hammond, Louisiana.

PLAINTIFF learned that the lead officer in the Greensburg, Louisiana raid was DEFENDANT MICHAEL MARTIN (DEFENDANT MM) who was not a legitimate police officer. Because PLAINTIFF had information from Greensburg Town officials that DEFENDANT MM had previously been employed as a Greensburg Police Chief but had been fired and removed after an FBI investigation concluded that DEFENDANT MM was responsible for allowing DEFENDANT MM's son to steal drugs and money from DEFENDANT GPD' police evidence room.

After PLAINTIFF was informed that police impersonator, DEFENDANT MM had arrested PLAINTIFF' husband on false allegations, which have since been dropped, PLAINTIFF tried to secret away from Greensburg, Louisiana until more information was accessed concerning the cause of the arrest of PLAINTIFF' husband by DEFENDANT MM and members of DEFENDANT GPD.

On Sunday October 8th, 2023, after making pleas for assistance and information on social media, the hotel room where PLAINTIFF was staying was raided by members of DEFENDANT GPD and members of the DEFENDANT, CITY OF HAMMOND POLICE DEPARTMENT (DEFENDANT CHPD).

122  For more than 20 minutes PLAINTIFF questioned the officers of DEFENDANT GPD and members
123  of the DEFENDANT, CITY OF HAMMOND POLICE DEPARTMENT (DEFENDANT CHPD)
124  as to the reason for their actions. PLAINTIFF was informed that a warrant had been issued for
125  Greensburg resident Debra Cooper, who was also in the hotel room with PLAINTIFF.
126
127  PLAINTIFF acknowledged the officers and opened the door, DEFENDANT BRITTANY LUCIA
128  (DEFENDANT LUCIA) of DEFENDANT CHPD escorted PLAINTIFF out to the hallway corridor
129  and handcuffed PLAINTIFF. PLAINTIFF was informed that DEFENDANT LEE CARMONA
130  (DEFENDANT CARMONA) of the DEFENDANT GPD had requested assistance from
131  DEFENDANT CHPD to apprehend Debra Cooper.
132
133  After Debra Cooper was taken from the location by ambulance, DEFENDANT LUCIA then
134  escorted PLAINTIFF to her police vehicle and informed PLAINTIFF that PLAINTIFF was under
135  arrest for offenses which never took place and which DEFENDANT LUCIA had no proof nor did
136  DEFENDANT LUCIA have any evidence of any offense.
137
138  DEFENDANT LUCIA committed an act of Aggravated Kidnapping, leading to current and
139  continued false imprisonment of PLAINTIFF. Even after DEFENDANT GPD issued written
140  communication that no charges were pending against PLAINTIFF, DEFENDANT CHPD continues
141  to detain PLAINTIFF on fabricated claims initiated by DEFENDANT CARMONA and
142  DEFENDANT LUCIA.
143
144  Plaintiff employed the assistance of family members to provide communication to with
145  DEFENDANT CHIEF EDWIN BERGERON (DEFENDANT BERGERON) but no
146  communications were tendered by DEFENDANT BERGERON or DEFENDANT CHPD
147
148  PLAINTIFF declares that DEFENDANTS ET AL have operated incovin, to racially subjugate and
149  deliberately commit acts of paper genocide, piracy, official oppression and suppression to protect
150  and shield the actions of police impersonator DEFENDANT MM, whose initial false claims
151  spiraled out of control leading to a false arrest of PLAINTIFF.
152

153  Actions committed by DEFENDANTS ET AL are actions of discriminative and systemic police
154  corruption to deny PLAINTIFF' rights protected under the Civil Rights Act and PLAINTIFF'
155  human rights under the United Nations International Covenant Convention.
156
157  PLAINTIFF claims against DEFENDANTS ET AL for damage and destruction of safe and
158  productive existence, Constructive Fraud, Aggravated Kidnapping, Identity Theft, Unlawful
159  Conversion, Economic Deception, false imprisonment, false arrest, unlawful possession of human
160  beings to be used as human capital, as described in US President Bill Clinton' Executive Order
161  13037 – Commission to Study Capital Budgeting, March 3, 1997
162  PLAINTIFF contends that DEFENDANT' ET AL are responsible for violations of the rights of
163  PLAINTIFF under Articles I (right to life), II (right to equality before the law), XVIII (right to a
164  fair trial).
165
166  PLAINTIFF claims that under coercion and threat, PLAINTIFF was injected with an unknown
167  substance by members of the DEFENDANT TANGIPAHOA CORRECTIONAL FACILITY
168  (DEFENDANT TANGIPAHOA). PLAINTIFF has suffered consistent pain from the forced
169  injection, where plaintiff was threatened with no phone access or bond if plaintiff refused the test
170  without full knowledge of the intent and procedure of the test.
171
172  PLAINTIFF is denied the free unencumbered right to movement as defined here; Article 13 of the
173  Universal Declaration of Human Rights. The right is enshrined in Article 12 of the International
174  Covenant on Civil and Political Rights: 1. Everyone lawfully within the territory of a State shall,
175  within that territory, have the right to liberty, movement and freedom to choose her residence. The
176  above-mentioned rights shall not be subject to any restrictions except those which are provided by
177  law, are necessary to protect national security, public order, public health or morals or the rights
178  and freedoms of others and are consistent with the other rights recognized in the present Covenant.
179
180  PLAINTIFF has suffered and is still suffering insurmountable human rights deprivations and
181  violations, as a consequence of DEFENDANTS ET AL decisions to violate PLAINTIFF' rights to
182  freedom, Due Process of law, Probable Cause and malicious prosecution committed by
183  DEFENDANTS ET AL.
184

PLAINTIFF' life has been placed in a state of fear, danger and apprehension, instilled when PLAINTIFF was forcefully removed from hotel without a Warrant or any evidence of a crime committed by PLAINTIFF, who continues to suffer under oppressive racists doctrines, in violation of the International Convention on the Elimination of All Forms of Racial Discrimination (ICERD), United Nations Educational, Scientific and Cultural Organization (UNESCO)' Declaration on Race, also *See, e.g., Maya Indigenous Cmtys. of the Toledo District v. Belize*, Case 12.053, Inter-Am. C.H.R., Report No. 40/04, ¶ 163 (2004),

DEFENDANTS ET AL are or at all times relevant to this Complaint, employees of DEFENDANTS GPD ET AL and DEFENDANT CHPD ET AL and are sued individually and collectively, defined as representatives of a defendant class composed of all persons and entities (including each named defendant) that are currently subject to the matters of this Complaint.

## II. Jurisdiction

The jurisdiction of the Article III Court is invoked pursuant to Jus Cogens breach of a peremptory norm of international law, See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 264–68 (1977). Cf. RECHTSCHAFFEN & GAUNA, supra note 75, at 49–53 (discussing racism as a cause of environmental justice problems) and where Petitioner has protected status of the victim and is a member of a discrete and insular minority, United States v. Carolene Products Co., 304 U.S. 144, 153 n.4 (1938). See also Edward J. Erler, Equal Protection and Personal Rights: The Regime of the "Discrete and Insular Minority," 16 GA. L. REV. 407 (1982), See, e.g., Soc. and Econ. Rights Action Ctr. for Econ. and Soc. Rights v. Nigeria, Communication No. 155/96, African Commission on Human and Peoples' Rights (2001), at paras. 44–48 (explaining that Nigeria has an obligation to refrain from interfering with rights, to ensure that others respect rights, and to fulfill its obligations under human rights regimes to protect rights and freedoms).

PLAINTIFF makes claims for relief under Jus Cogens and the Alien Tort Statute in the District Court for the United States of America located in the District of Columbia, within the judicial foundation of violations of international norms causing infringement upon PLAINTIFF's liberty, rights and the forced assimilation and integration of PLAINTIFF into colonial societal and commercial constructs, such violations against PLAINTIFF have caused traumatic effect and influence on PLAINTIFF' life.

218  PLAINTIFF finds no other method of redress than to go to the highest Court in America, the Court
219  of Article III, "DISTRICT COURT For the UNITED STATES Of AMERICA" as defined herein
220  and states:

222  UNITED STATES CODE "CHAPTER 5—UNITED STATES CODE, DISTRICT COURTS";
223  ending with the paragraph below: "HISTORICAL AND REVISION NOTES." If you were not
224  aware of pages 42 and 43 of Title 28 U.S.C., or if you have trouble reading or printing out these
225  pages, you can also access Title 28 U.S.C. by going to http://uscode.house.gov/title_28.htm.

227  The District Court for the United States of America, District of Columbia [Washington, D.C.] is
228  the proper venue and PLAINTIFF has examined the statute law that created every United States
229  district court and has found only one instance where Congress appeared to ordain and establish an
230  Article III United States district court.

232  In 1959, the U.S. Congress created an Article III United States district court for Hawaii but made
233  no provision for Article III judges by specifically precluding the President from appointing them.
234  The Code specifically provides for territorial judges for the Hawaiian Article III court. Title 28
235  U.S.C.—Judiciary and Judicial Procedure have been enacted into positive law, so the Code shows
236  the same kinds of courts as are found in the statutes. Chapter 5 of Title 28 U.S.C.—District Courts
237  consist of Sections 81 through 144. The names of all 50 states of the Union will be found from
238  Sections 81 to 131 and in addition, in Section 88 will be found the District of Columbia and in
239  Section 119 Puerto Rico. The facts are presented supporting that a non-ARTICLE III court in any
240  state of the United States cannot exercise Article III judicial power, therefore the DISTRICT
241  COURT FOR THE UNITED STATES OF AMERICA is the proper jurisdictional venue for
242  PLAINTIFF' claims.

244  Plaintiff provides as an example of a fact: Title 28 U.S.C. is territorial law; this fact will be
245  supported by material found in the notes to §91. Those in federal litigation, or who are
246  contemplating that exercise, should be aware that legal justice is available only from courts that
247  have judicial power. Any litigant in any United States district court in any state of the Union is
248  warned that these courts have no Article III, Section 2 judicial power whatsoever, and are legislative
249  jurisdiction, i.e., Color of law constructs of jurisprudence. District courts and district court judges

of the United States have been mistaken for Article III courts and judges since the Judiciary Act of 1789. The mistaken belief that a court has jurisdiction is sufficient to confer it when everyone is equally mistaken; but that jurisdiction remains what it is and not what it is mistaken to be.

No United States district court (legislative) in any state may lawfully exercise Article III court power. *The lawful jurisdiction of the federal district court (Article III) or courts is limited to those places where Congress has exclusive jurisdiction.* It is also clear that federal judges and federal courts have been used in the past by the federal government to create the appearance of an Article III tribunal, but the transferring of an Article III judge to a state territory does not create an Article III court or jurisdiction. The federal courts within the several states, known as United States District Courts, are federal and territorial, in that these courts implement administrative law on territory exclusively under the jurisdiction of the United States of America $_{Corporate/legislative}$, and not Congress $_{Constitutional}$. ARTICLE III is the jurisdiction for this claim involving environmental racism, apartheid and international fraud.

Only Hawaii has an Article III district court, and that court cannot function as one, because no ARTICLE III judges are appointed to that court; no other state has an Article III court. The use of the term, "district courts for the United States" refers to Article III courts. There are no more than two "district courts for the United States." There is no doubt that the district court for Hawaii is an Article III court—that's one. The § 88 court for the District of Columbia is another.

The Historical and Revision Notes to that section make it clear that the District of Columbia district court is a constitutional court established and ordained under Article III. The existence of at least two "district courts for the United States" permits the general usage of language that refers to the "district courts for the United States" as Article III courts.

The United States Supreme Court in two cases: Balzac v. Porto Rico, 258 U.S. 298 (1921) and Mookini v. United States, 303 U.S. 201 (1938) made it clear that a *"district court for the United States" described a court created under Article III* and a *"United States district court" described a territorial court*. The former identified a constitutional court of the United States exercising the judicial power of the United States and the latter merely identified a court for a district of the government of the United States.

8

282  The United States district courts are territorial and without judicial constitutional power. This has
283  been so since the Judiciary Act of 1789. As such, the United States District Court for the U.S.
284  within the territory of Louisiana is an inferior jurisdiction as it lacks the jurisdiction to properly
285  address PLAINTIFF's claim and demand is made for an Article III Judge in Article III venue in the
286  District Court For The United States of America, District of Columbia [Washington, D.C.].

288  Relief may be awarded pursuant to Law of nations and this Court has venue of this action because
289  the subject matter claims of (A) environmental deprivations of human rights, (B) particularly
290  vulnerable racial communities and (C) procedural environmental rights violations, and (D)
291  plaintiff's foreign aborigine status claims falls within the venue of the District Court for the United
292  States of America, District of Columbia [Washington, D.C.] under Jus Cogens, Alien Tort Statute.
293  G.A. Res 49/146, UN. Doc. No. A/RES/49/146 (Feb. 7, 1995) (reiterating that racism is one of the
294  world's worst problems); U.N. Econ. & Soc. Council, Comm. on Econ., Soc., and Cultural Rights,
295  *General Comment No. 20*, ¶ 2, U.N. Doc. E/C.12/GC/20 (July 2, 2009) ("Non-discrimination and
296  equality are fundamental components of international human rights law . . . ."); Declaration on Race
297  and Racial Prejudice, U.N. Educational, Scientific and Cultural Organization (UNESCO), 20th
298  Sess., gen. conf., U.N. Doc E/CN.4/Sub.2/1982/2/Add.1, annex V (Oct. 17, 1982) [hereinafter
299  UNESCO Declaration on Race]; Int'l Law Comm'n, *Fragmentation of International Law:*
300  *Difficulties Arising from the Diversification and Expansion of International Law*, *33, U.N. Doc.
301  A/CN.4/L.702 (July 18, 2006); Juridical Condition and Rights of the Undocumented Migrants,
302  Advisory Opinion OC-18/03, Inter-Am. Ct. H.R. (ser. A) No. 18, ¶ 1 (Sep. 27, 2003) (Pesantes, J.,
303  concurring) ("[E]quality and nondiscrimination are rights that form a platform on which others are
304  erected").

### Standard of Jurisdictional and International Norms

308  **U.N. Human Rights and Environment Report**, *supra* note 2, ¶ 175 (citing R.G. Ramcharan, The
309  Right to Life 310–11 (1983)) (stating that criminal and civil international law liability may arise
310  from environmental harm that threatens the right to life); Collins, *supra* note 125, at 129 (suggesting
311  environmental deprivations of rights have become customary international law because of
312  recognition of this concept by international, regional, and domestic courts). Amici in *Flores* argued
313  that environmental deprivations of rights violate customary international law, but their assertions
314  are unlikely to be persuasive given *Flores*' sound rejection of their authority. Flores v. S. Peru

Copper Corp., 414 F.3d 233, 265 (2d Cir. 2003) (citing The Paquete Habana, 175 U.S. 677, 700 (1900)). *Compare* Collins, *supra* note 125, at 129 (suggesting, without expressly stating, that environmental deprivations of rights are censured under customary international law) *with* Cohan, *supra* note 131, at 154 (stating that there is "little doubt" that indigenous peoples' environmental rights are protected under customary international law). *See* Sarah Krakoff, *Tribal Sovereignty and Environmental Justice*, *in* Justice and Natural Resources: Concepts, Strategies, and Applications 161, 167 (Kathryn M. Mutz et al. eds., 2002) (noting the similarities between African American and Native American struggles for environmental justice); Kathryn M. Mutz, *Mineral Development: Protecting the Land and Communities*, *in* Justice.

The **Stockholm Declaration**, discussed *supra* in Part III.A, speaks to the widespread acceptance of the prohibition on environmental racism. It impliedly prohibits environmental racism by recognizing the fundamental right to equality in an environment that permits a life of dignity and wellbeing. Stockholm Declaration, *supra* note 57, at 4 at princ. 1. The United Nations acknowledges that "Principle 1 of the Stockholm Declaration established a foundation for linking human rights and environmental protection." Joint United Nations Environmental Programme-Office of the High Commissioner of Human Rights Expert Seminar on Human Rights and the Environment, Geneva, Switz., Jan. 14–16, 2002, Human Rights and Environment Issues in Multilateral Treaties Adopted between 1991 and 2001 (prepared by Dinah Shelton), @ ohchr.org/english/issues/environment/environ/bp1.htm; accord U.N. Human Rights and Environment Report, supra note 2, ¶¶ 32, 50…. The 1992 Rio Declaration, issued 20 years after the Stockholm Declaration, reaffirms the international community's commitment to these principles. *See* Rio Declaration, *supra* note 53,

The **African Charter and the San Salvador Protocol** provide the same principle on a regional level within Africa and the Americas, respectively, by recognizing the right to environment alongside the obligation of non-discrimination. Together, these concepts prohibit environmental deprivations of rights. African Charter, *supra* note 81, art. 2 (non-discrimination), art. 21 (right to environment); Organization of American States, Additional Protocol to the American Convention on Human Rights in the Area of Economic, Social and Cultural Rights art. 3 (obligation of non-discrimination), art. 11 (right to environment), Nov. 17, 1988, O.A.S.T.S. No. 69 (entered into force Nov. 16, 1999) [hereinafter San Salvador Protocol]. The Restatement recognizes the existence of

10

regional customary international law. Restatement (Third) of Foreign Relations Law of the United States § 102 cmt. e (1987).

The **Apartheid Convention**'s definition of "the crime of apartheid" includes any measure designed to divide the population along racial lines, including the expropriation of property and labor exploitation of a racial group. Both the Apartheid and Genocide Conventions prohibit the deliberate imposition on a racial group of living conditions calculated to cause its physical destruction. Such conditions would surely entail violations of social and economic rights, for example, the rights to life, health, housing, or food. By prohibiting the larger wrong, therefore, the international community also sought to prohibit the lesser wrongs included therein. The Conventions thus seek to prevent environmental deprivations of rights, especially the rights to life, health, and property. Apartheid Convention, *supra* note 77, art. II(d) (expropriation of property), art. II (e) (labor exploitation). The Apartheid Convention limits its definition of group solely to racial groups, while the Genocide Convention contains a slightly broader definition. Apartheid Convention, *supra* note 77, art. II(b); Genocide Convention, *supra* note 80, art. II(c) (defining "group" as shared national, ethnic, racial or religious origin). For a discussion of the intent requirements of the Apartheid and Genocide Conventions, see *supra* note 94. Apartheid and Genocide Conventions, establishes that discriminatory expropriation of, or interference with, property is a form of environmental racism.

**International Convention on the Elimination of All Forms of Racial Discrimination** (ICERD) and the International Convention on the Suppression and Punishment of the Crime of Apartheid (Apartheid Convention). Stephens et al., *supra* note 9, at 203. These agreements are relevant to proving that racial non-discrimination is a norm of customary international law; however, as the Restatement cautions, it is only systematic racial discrimination, practiced by the state as a matter of state policy, that violates customary international law. Restatement (Third) of Foreign Relations Law of the United States § 702 cmt. i (1987); *see supra* notes 69–70 and accompanying text. International Convention on the Elimination of All Forms of Racial Discrimination, *opened for signature* Dec. 21, 1965, S. Exec. Doc. C, 95-2 (1978), 660 U.N.T.S. 195 (entered into force Jan. 4, 1969) [hereinafter ICERD]; *see* Kevin Boyle & Anneliese Baldaccini, *A Critical Evaluation of International Human Rights Approaches to Racism, in* Discrimination and Human Rights. Racism 135, 149 (Sandra Fredman ed., 2001) (noting that ICERD was the most widely ratified international human rights treaty until 1993, when the Convention on the Rights of the Child surpassed it). Notably, the ICERD imposes duties on States Parties that are "more than merely promotional,"

11

380  Schwelb, *supra* note 1, at 1016, which adds to its authority. *See* Jeffrey M. Blum & Ralph G.
381  Steinhardt, *Federal Jurisdiction Over International Human Rights Claims*, 22 Harv. Int'l. L.J. 53,
382  89 (1981) (noting that the most authoritative international norms are those that create immediate
383  legal obligations, as compared to non-obligatory norms that merely encourage appropriate action).

385  <u>Restatement (Third) of Foreign Relations Law of the United States</u> §§ 102(3), 102 cmt. i,
386  Introductory Note to Part VII (1987); *see* Stephens et al., *supra* note 9, at 67 (noting that widely
387  ratified international agreements, even those that are non-binding, may reflect a norm of customary
388  international law); Blum & Steinhardt, *supra* note 76, at 89 ("Obligatory norms typically are
389  expressed in numerous international instruments, including those that are most authoritative in that
390  they reflect a broad consensus of states."). This may be true even when agreements do not purport
391  to codify customary international law. Restatement (Third) of Foreign Relations Law of the United
392  States § 102 reporter's note 5 (1987).

394  The **<u>SOSA NORM for Environmental Racism in International Law</u>**; environmental
395  deprivations of rights are censored in both the Inter-American and African regional human rights
396  systems and decried and defined most strongly by the Committee *on* Economic, *Social and* Cultural
397  Rights CESCR. Protection against environmental racism targeted at indigenous peoples and their
398  property rights is strong across the world, as evidenced by Inter-American, HRC, and CERD
399  jurisprudence as well as Australia's Mabo decision and its numerous successors in other countries.
400  Similar protections have been extended to prevent discrimination in procedural environmental
401  rights, with the Inter-American system, the HRC, and Botswana as examples. Judicial decisions
402  evidence an especially strong protection of the right to property and procedural rights. The number
403  of decisions suggests that the norm prohibiting environmental racism is widely accepted, as *Sosa*
404  requires. By condemning concrete instances of environmental racism, these decisions suggest that
405  the norm has definite content, thereby meeting *Sosa*'s first prong.

### III. PARTIES

409  PLAINTIFF Akuwa Ishak of the Maipuri Arauan Nation is an American aborigine tribal citizen
410  recorded with the U.S. State Department, Department of Commerce and the U.S. Census Bureau
411  and in 2015 PLAINTIFF became one of many beneficiaries of a U.S. Commerce Department'
412  American aborigine identity correction, which was ordered by United States Inspector General

Todd Zinser, February 2015, and at all relevant times and up to the present, PLAINTIFF has continuously maintained tribal relations throughout the territories remains intact and has never been terminated or abandoned.

From the very beginning of PLAINTIFF' warrantless arrest, PLAINTIFF challenged the jurisdiction of the arrest, because PLAINTIFF was arrested without Warrant nor any valid information that PLAINTIFF had committed a crime.

PLAINTIFF makes claim against DEFENDANT LUCIA and DEFENDANT CARMONA for false arrest and aggravated kidnapping, torment and illegal process against PLAINTIFF which included openly ordering the illegal detention in the facility of DEFENDANT TANGIPAHOA jail.

PLAINTIFF declares that the negligence of DEFENDANTS ET AL led to agency-wide actions of "Official Oppression", where PLAINTIFF is and was falsely accused, kidnapped and imprisoned and misclassified as someone PLAINTIFF is not, through forced assimilation into accordance with policies created and used by DEFENDANTS ET AL, and PLAINTIFF declares that those same policies caused or encouraged the policies used by DEFENDANTS LUCIA and CARMONA and caused the pain, suffering and aggravated kidnapping of PLAINTIFF by DEFENDANTS ET AL,.

DEFENDANTS ET AL are sued both officially and individually and pursuant to Rules 23(a) and (b)(1) of the Federal Rules of Civil Procedure, as representatives of the defendant class, composed of all persons or entities that operate as employees and party to any offense against PLAINTIFF in this matter as of the filing of this complaint. The number of members of the defendant class is approximately 200 or more persons and is thus so numerous that joinder of all members is impracticable. There are questions of law and fact common to the members of the defendant class, and the defenses of the named representatives are typical of the defenses of the class. The representative defendants will fairly and adequately represent the interests of the defendant class.

The prosecution of separate actions against individual members of the defendant class would create a risk of adjudications with respect to individual members of the class which would, as a practical matter, be dispositive of the interests of the other proposed class members or substantially impair or impede their ability to protect their interests.

445  **DEFENDANTS** CEDRIC BURRIS (DEFENDANT BURRIS and DEFENDANT GPD and
446  DEFENDANT EDWIN BERGERON (DEFENDANT BERGERON and DEFENDANT CITY OF
447  HAMMOND (DEFENDANT CITY OF HAMMOND) at all times relevant were employees and the
448  supervisors of DEFENDANTS CARMONA AND LUCIA, and DEFENDANTS CARMONA and LUCIA
449  were operating under the control of DEFENDANTS BURRIS and BERGERON respectively.
450
451  **DEFENDANT BURRIS** at all times relevant to this complaint was supervisor of DEFENDANTS
452  CARMONA and DEFENDANT MARTIN, covered by official constitutional Oath related
453  Insurance Bond, attached to rank of employment as a senior ranked employee operating under the
454  policies, guidance and direction of DEFENDANTS GPD and DEFENDANT TOWN OF
455  GREENSBURG.
456
457  **DEFENDANT BERGERON** at all times relevant to this complaint was supervisor of
458  DEFENDANTS LUCIA and other unknown officers of DEFENDANT CHPD, covered by official
459  constitutional Oath related Insurance Bond, attached to rank of employment as a senior ranked
460  employee operating under the policies, guidance and direction of DEFENDANTS CHPD and
461  DEFENDANT CITY OF HAMMOND.
462
463  PLAINTIFF Akuwa Ishak declares that on October 8th 2023, PLAINTIFF was arrested without
464  Warrant or Court Order, on hearsay allegations with no evidence of a crime by DEFENDANTS
465  CARMON and LUCIA committing offense of aggravated kidnapping and malicious imprisonment
466  of PLAINTIFF, causing now 9 days physical imprisonment, kidnapping and physical and emotional
467  injury of PLAINTIFF, violating PLAINTIFF' right to liberty, causing similarities as in **"Trezevant**
468  **v. City of Tampa, 746 F.2d 815 (11th Cir. 1984)", where PLAINTIFF shows PLAINTIFF was**
469  **similarly violated, see EXHIBIT B (FEE SCHEDULE), and in this PLAINTIFF is asking for**
470  **seven million, eighty thousand dollars ($7, 080,000) for damages and violations related to**
471  **claims stated herein.**
472
473  **DEFENDANTS** BURRIS and DEFENDANT GREENSBURG POLICE DEPARTMENT, "GPD" and
474  DEFENDANT BERGERON and DEFENDANT CITY OF HAMMOND (DEFENDANT CITY OF
475  HAMMOND POLICE DEPARTMENT) "CHPD" cause via improper training and negligence PLAINTIFF'
476  arrest without Warrant or Court Order, on hearsay allegations with no evidence of a crime through
477  agents DEFENDANTS CARMON and LUCIA committing offense of aggravated kidnapping and

malicious imprisonment of PLAINTIFF, causing now **5** days physical imprisonment, kidnapping and physical and emotional injury of PLAINTIFF, violating PLAINTIFF' right to liberty, causing similarities as in **"Trezevant v. City of Tampa, 746 F.2d 815 (11th Cir. 1984)", where PLAINTIFF shows PLAINTIFF was similarly violated, see EXHIBIT B., and in this PLAINTIFF is asking for seven million, three hundred eighty six thousand dollars ($7, 386,000 + 1,206,000) for damages and violations related to claims stated herein.**

The false and fraudulent information filed by DEFENDANTS CARMONA, LUCIA and MARTIN and approved by DEFENDANTS BURRIS and BERGERON has caused a tort of pain, suffering, deprivation, physical injury and destruction to PLAINTIFF' reputation, beyond causing PLAINTIFF to have a much higher Bond, and creating hardship and delay in PLAINTIFF gaining proper Bond to be released, causing unnecessary and prolonged imprisonment.

**DEFENDANT CHPD and GPD** at all times is responsible for its employees and is liable for providing policy for arrest guidelines and is responsible for all breakdowns in communication of orders and arrest procedures, and such policies as used and or ignored by DEFENDANTS CARMONA, LUCIA and MARTIN causing tremendous damage against PLAINTIFF.

### Points and Authority

PLAINTIFF herein has been made subject to DEFENDANTS ET AL, yet PLAINTIFF has never willingly or knowingly filed any known agreement to participate in such inhumane subjugation under DEFENDANTS ET AL and now demands proof that DEFENDANTS ET AL has the authority to demand or force under any policy the illegal detention, kidnapping and injections of foreign substances into PLAINTIFF' body against PLAINTIFF' will and without PLAINTIFF' full and knowing consent.

Plaintiff has brought this action against the named DEFENDANTS ET AL, only because all other avenues of redress have been closed until this filing; PLAINTIFF again cites that DEFENDANTS ET AL have perpetuated a system that discriminates, on grounds of race, against PLAINTIFF by denying access to identity and human rights, and refusing redress for DEFENDANT' ET AL' wrongs, deprivations, involuntary servitude, apartheid actions PLAINTIFF.

15

**REMEDY**

DEFENDANTS ET AL must affirmatively seek diverse initiatives extending strong protections against environmental racism to PLAINTIFF's rights, recognizing the vulnerability of PLAINTIFF's specific racial groups to environmental and human racism and discrimination.

Declaratory Judgment
  a) PLAINTIFF requests declaratory judgment that the defendant's actions violated her rights to be Free from unlawful arrest and seizure as guaranteed by the Fourth Amendment to the United States Constitution.
  b) That DEFENDANTS ET AL actions violated PLAINTIFF's rights, privileges and immunities afforded her by the United States and DEFENDANTS GPD and CHPD, as attested to by the PLAINTIFF' documents.

Injunctive Relief
  a) PLAINTIFF demands that the DEFENDANTS ET AL herein be enjoined from any forms of discrimination towards PLAINTIFF. PLAINTIFF is currently temporarily located at PLAINTIFF' Chicago address due to threats against PLAINTIFF' life. Injunction requested against DEFENDANT'S ET AL actions of Official Oppression of PLAINTIFF.

Compensatory Damages (SEE EXHIBIT B)

Monetary Damages   (SEE EXHIBIT B)
PLAINTIFF shows PLAINTIFF was similarly violated, by DEFENDANTS ET AL, see EXHIBIT B., and in this PLAINTIFF is asking for Triple ie ( times 3) for False Arrest.

  a) That DEFENDANTS ET AL pay monetary damages in accordance with standard compensation allowed for violations committed by DEFENDANTS ET AL as herein stated, and in addition to damages of $7,080,000 requested in accordance with Trezvant v City of Tampa.

**Demand for Relief0**

WHEREFORE, PLAINTIFF respectfully prays for an order:

Willful "Torts" committed by a PUBLIC SERVANT

Notice and Claim Of Damages/Fee Schedule
**Akuwa Ishak**

I, Akuwa Ishak, a living flesh and blood woman, charge these fees for violations of my God given and Constitutional and indigenous rights. This is a copy of my TRUE BILL in commerce.

PROOF OF CLAIM, "actual" or "compensatory damages" in actions/claims for false arrest and/or false imprisonment has been established at 25,000 USD per twenty-three (23) minutes, 1,416,000.00 per day. Punitive damages may be set by the injured party and specifically the Undersigned as the injured party within the above referenced alleged Criminal case/Cause. [See: Trezevant v. City of Tampa, 741 F.2d 336 (1984), wherein damages were set as 25,000 USD [every twenty-three minutes in a false imprisonment case,]

PROOF OF CLAIM: The above cited case; i.e.. Trezzvant v. City of Tampa can be utilized by the Undersigned in determining actual/compensatory damages should Respondent(s) agree the Undersigned has been falsely imprisoned and Respondent(s) can prove any valid, lawful, and reasonable objection as to why it should not, or cannot, be so utilized and applied in this matter. These Damages, in part, were determined by GOVERNMENT itself for the listed: Emoluments Violations - 18 USC 241,242,643,/28 USC 1109   (SEE EXHIBIT B FEE SCHEDULE)

PLAINTIFF

*"I declare under penalty of perjury that the foregoing is true and correct.* 28 U.S.C. § 1746. Unsworn declarations under penalty of perjury."

*Akuwa Habeika Ishak* (signature)
Akuwa Ishak
Maipuri Arauan Nation

**Executed on October 17th, 2023**